PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-4300
_____

UNITED STATES OF AMERICA

v.

KENNETH DIXON,
 Appellant
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 4-08-cr-00456-001)
District Judge:  Honorable John E. Jones, III
_____

Argued May 24, 2011
Before:  FUENTES, FISHER and NYGAARD, *Circuit
Judges*.

(Filed: August 9, 2011)

John H. Reed
102 North Market Street
Selinsgrove, PA  17870

Brett G. Sweitzer (Argued)
Defender Association of Philadelphia
Federal Court Division
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA  19106
        *Counsel for Appellant*

William C. Simmers
Office of United States Attorney
240 West Third Street, Suite 316
Williamsport, PA  17701

Theodore B. Smith
Executive Office of the United States Attorney
Evaluation & Review Staff
600 E Street, N.W.
Suite 8500, Bicentennial Building
Washington, DC  20530

Robert A. Zauzmer (Argued)
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA  19106
        *Counsel for Appellee*

———

OPINION OF THE COURT
———

FISHER, *Circuit Judge*.

2

The question presented in this appeal is whether the more favorable mandatory minimum prison sentences imposed by the Fair Sentencing Act of 2010 (the "FSA" or the "Act") apply retroactively to defendants, like Kenneth Dixon, who committed their crimes before the Act became law, but who were sentenced afterwards. We hold that the FSA does apply in this instance. The language of the Act reveals Congress's intent that courts no longer be forced to impose mandatory minimums sentences that are both indefensible and discriminatory. Therefore, we will vacate the judgment of the District Court and remand for resentencing.

I.

From November 2007 until December 2008, Dixon conspired to distribute approximately fifty-one grams of crack cocaine. On March 19, 2010, he pled guilty to conspiracy to distribute fifty grams or more of cocaine base, in violation of 21 U.S.C. § 846, and receipt and possession of an unregistered firearm, in violation of 26 U.S.C. § 5861(d). At the time of Dixon's offense, the Anti-Drug Abuse Act of 1986 (the "1986 Act") mandated penalties for powder cocaine and crack cocaine according to a 100:1 ratio, creating a pronounced disparity between offenders convicted of possessing crack cocaine and those convicted of possessing powder cocaine. More precisely, a conviction involving five grams of crack cocaine resulted in the same five-year mandatory minimum term of imprisonment as a conviction involving 500 grams of powder cocaine. Similarly, a conviction involving fifty grams of crack cocaine resulted in the same ten-year mandatory minimum term of imprisonment

as a conviction for 5,000 grams of powder cocaine. 21 U.S.C. § 841(b)(1)(A)(iii) & (B)(iii) (2006).

The initial justification for this difference in treatment – that crack cocaine was more dangerous and addictive than powder cocaine – repeatedly came under attack as the implications of the disparity emerged. *See Kimbrough v. United States*, 552 U.S. 85, 97-99 (2007) (describing the United States Sentencing Commission's criticism of the 100:1 ratio). This controversy resulted from data suggesting that African-American defendants received disproportionately higher sentences for crack cocaine offenses than white defendants convicted of powder cocaine offenses, even though the drugs were essentially the same substance. *See generally* Knoll D. Lowney, *Smoked Not Snorted: Is Racism Inherent in Our Crack Cocaine Laws?*, 45 Wash. U. J. Urb. & Contemp. L. 121 (1994). The Sentencing Commission identified major problems with the crack/powder disparity, namely that the assumptions regarding violence and addictiveness were unfounded, that it did not effectively punish major drug traffickers, and that it imposed severe sentences primarily upon African-American offenders. *See Kimbrough*, 552 U.S. at 98 (summarizing the Sentencing Commission's efforts to alter 100:1 crack/powder disparity).

Prior to Dixon's sentencing hearing, however, Congress passed the FSA, and it became law when the President signed it on August 3, 2010. *See Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1151 n.1 (3d Cir. 1989) ("Where no specific effective date is provided, the provision or statute becomes effective upon the date the president signs the bill."). Congress described the

4

FSA as "[a]n Act To restore fairness to Federal cocaine sentencing." Fair Sentencing Act of 2010, Pub. L. 111-220, § 2, 124 Stat. 2372, 2372 (2010). The FSA reduced the crack/powder ratio to approximately 18:1. According to the Act, the five-year mandatory minimum penalty for possessing crack cocaine is not triggered until a person possesses twenty-eight grams and the ten-year mandatory minimum penalty for possessing crack cocaine is not triggered until a person possesses 280 grams (the triggers for powder cocaine remain 500 grams and 5,000 grams, respectively). *Id.*

Recognizing the need to connect the new mandatory minimum penalties with the Sentencing Guidelines, Section 8 of the Act vests the Sentencing Commission with emergency authority to:

> (1) promulgate the guidelines, policy statements, or amendments provided for in this Act as soon as practicable, and in any event not later than 90 days after the date of enactment of this Act . . . and

> (2) pursuant to the emergency authority provided under paragraph (1), make such conforming amendments to the Federal sentencing guidelines as the Commission determines necessary to achieve consistency with other guideline provisions and applicable law.

*Id.* § 8. New, FSA-compliant, sentencing Guidelines implementing the 18:1 ratio went into effect on November 1,

5

2010.  *See* Notice of a Temporary, Emergency Amendment to Sentencing Guidelines and Commentary, 75 Fed. Reg. 66,188 (Oct. 27, 2010); U.S.S.G. supp. to app. C, amend. 748 (Supp. 2010) (amending U.S.S.G. § 2D1.1(c)) (effective Nov. 1, 2010).[1]  Additionally, Congress directed the Sentencing Commission to "study and submit to Congress a report regarding the impact of the changes in Federal sentencing law under this Act[.]"  FSA § 10.

Under the 1986 Act, Dixon faced a mandatory minimum of ten years' imprisonment because he possessed more than fifty grams of crack cocaine.  If the FSA applied, however, he would be subject to a mandatory minimum of five years' imprisonment.  Before the District Court, Dixon argued that the mandatory minimums set forth in the FSA should govern because the Act was in effect on the date of his October 25, 2010 sentencing hearing.  The District Court disagreed and concluded, in accordance with the Government's view, that a mandatory minimum term of ten years' imprisonment was required, based on the provisions of the 1986 Act in effect at the time of Dixon's offense conduct.  Accordingly, it imposed a sentence of 121 months' imprisonment, followed by five years of supervised release for the drug crime, and a concurrent sentence of 120 months'

---

[1] On June 30, 2011, the Sentencing Commission unanimously decided to apply the new Guidelines retroactively to defendants sentenced before the Act's passage.  That decision, however, does not affect the statutory mandatory minimums and has no bearing on the resolution of the issue before us.

imprisonment, followed by three years of supervised release for the gun crime.

Dixon filed a timely notice of appeal, arguing that the District Court should have applied the FSA to his sentence. The issue presented by Dixon's appeal is a purely legal one over which we exercise plenary review. *See United States v. Reevey*, 631 F.3d 110, 112 (3d Cir. 2010). Our jurisdictional authority for that review is provided by 29 U.S.C. § 1291 and 18 U.S.C. § 3742.[2]

## II.

The issue boils down to this: did Congress intend to preserve the mandatory minimum penalties for crack cocaine possession set forth in the 1986 Act that it repudiated in the FSA, or did it intend for Dixon to have the benefit of the ameliorative provisions of the FSA?[3] We conclude that

---

[2] After oral argument was held in this case, the Government submitted a letter to the Court pursuant to Federal Rule of Appellate Procedure 28(j) stating that it had reversed its position on the applicability of the FSA to Dixon. Before the District Court and, until now, before this Court, the Government argued that the Act should not apply to defendants whose offense conduct predated the FSA but were sentenced after. Having determined that its previous analysis of the Act was in error, the Government now agrees with the position set forth by Dixon in this appeal.

[3] As a threshold issue, we determine that our previous decision in *United States v. Reevey*, 631 F.3d 110 (3d Cir.

Congress intended the latter. The First and Eleventh Circuits

_____

2010), upon which the District Court relied, does not resolve the question presented in this appeal. When considering whether a law applies retroactively, the question is always "to whom"? In *Reevey*, we held that it did not apply retroactively to the group comprised of defendants who committed their crimes and who were sentenced before the Act was enacted. In doing so, we joined every Court of Appeal to consider the issue. *See United States v. Doggins*, 633 F.3d 379, 384 (5th Cir. 2011); *United States v. Bell*, 624 F.3d 803, 814-15 (7th Cir. 2010); *United States v. Brewer*, 624 F.3d 900, 909 n.7 (8th Cir. 2010); *United States v. Carradine*, 621 F.3d 575, 580 (6th Cir. 2010); *United States v. Lewis*, 625 F.3d 1224, 1228 (10th Cir. 2010); *United States v. Gomes*, 621 F.3d 1343, 1346 (11th Cir. 2010) (per curiam). The "to whom" question here is different. The issue in this case is whether the FSA applies to the separate group of defendants who committed their crimes before the Act was enacted, but who were sentenced afterwards. We specifically abstained from answering this question in *Reevey*. 631 F.3d at 115 n.5 (distinguishing a defendant in Dixon's position from Reevey because Reevey, unlike Dixon, committed his crime and was sentenced before the FSA was enacted). Our answer to the question whether Congress intended to apply the FSA to one group – defendants in Reevey's position – has no bearing on whether Congress intended to apply the FSA to another – defendants in Dixon's position. *See United States v. Fisher*, 635 F.3d 336, 339 (7th Cir. 2011) (concluding that a case similar to *Reevey* did not control whether the Act applies to defendants like Dixon).

8

have agreed.  *See United States v. Vera Rojas*, -- F.3d --, 2011 WL 2623579 (11th Cir. July 6, 2011); *United States v. Douglas*, -- F.3d --, 2011 WL 2120163 (1st Cir. May 31, 2011).  The Seventh Circuit has not.  *United States v. Fisher*, 635 F.3d 336 (7th Cir. 2011), *rehearing and rehearing en banc denied*, -- F.3d --, 2011 WL 2022959 (7th Cir. May 25, 2011).

The general common law rule "requires a court 'to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary.'" *United States v. Jacobs*, 919 F.2d 10, 11 (3d Cir. 1990) (quoting *Bradley v. School Bd. of Richmond*, 416 U.S. 696, 711 (1974)).  As a result of the common law rule, once Congress amended a criminal statute (including its penalties), all pending prosecutions – prosecutions that had not yet reached a final judgment in the highest court authorized to review them – were abated.  *See Bradley v. United States*, 410 U.S. 605, 607-08 (1973).  To avoid this result, Congress passed in 1871 what we now call the "general saving statute." *See* Act of Feb. 25, 1871, ch. 71, § 4, 16 Stat. 431, 432 (codified as amended at 1 U.S.C. § 109).  In its current form, the statute provides in pertinent part:

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or

prosecution for the enforcement of such penalty, forfeiture, or liability.

1 U.S.C. § 109 (the "Saving Statute").

Turning to the issue before us, the common law rule mandates that the FSA governs unless the "statutory direction" in this case, the Saving Statute, applies. Stated differently, the mandatory minimum penalties in the 1986 Act are preserved "unless the repealing Act shall so expressly provide[.]" 1 U.S.C. § 109. Notably, the Saving Statute is "a rule of construction . . . to be read and construed as a part of all subsequent repealing statutes, in order to give effect to the will and intent of Congress." *Hertz v. Woodman*, 218 U.S. 205, 217 (1910).

At first view, the Saving Statute's "express" statement requirement would appear to doom Dixon's argument, as the FSA does not mention retroactivity. But, the Supreme Court has interpreted the Saving Statute in a more limited manner. The Saving Statute "cannot justify a disregard of the will of Congress as manifested, either expressly *or by necessary implication*, in a subsequent enactment." *Great N. Ry. Co. v. United States*, 208 U.S. 452, 465 (1908) (emphasis added). The import of this reasoning is that the Saving Statute cannot control when preserving repealed penalties would plainly conflict with the intent of Congress as expressed in a subsequent statute. To that end, the Saving Statute "must be enforced unless, either by express declaration or necessary implication, arising from the terms of the law as a whole, it results that the legislative mind will be set at naught by giving effect to the provisions [of the Saving Statute]." *Id.*; *see also*

10

*Warden, Lewisburg Penitentiary v. Marrero*, 417 U.S. 653, 659 n.10 (1974) ("But only if [the repealing statute] can be said by fair implication or expressly to conflict with [the Saving Statute] would there be reason to hold that [the repealing statute] superseded [the Saving Statute].").[4]

This reasoning highlights a key principle of Congress's legislative power under Article I of the Constitution: "that one legislature is competent to repeal any act which a former legislature was competent to pass; and that one legislature cannot abridge the powers of a succeeding legislature." *Fletcher v. Peck*, 6 Cranch 87, 135 (1810). To put it another way, regardless of what the Saving Statute says, Congress can express its desire to apply the FSA to Dixon without using "magical passwords" to do so. *Marcello v. Bonds*, 349 U.S. 302, 310 (1955) (discussing express statement requirement in Administrative Procedure Act); *see also Lockhart v. United States*, 546 U.S. 142, 148 (2005) (Scalia, J., concurring) ("We have made clear in other cases as well, that an express-reference or express-statement provision cannot nullify the unambiguous import of a subsequent statute." (citing *Great N. Ry.*, 208 U.S. at 465)). Notwithstanding the absence of a statement regarding the temporal application of the FSA, the "necessary" or "fair" implication of the text is that Congress intended to apply the Act in this situation.[5]

---

[4] Although the repealing laws in *Great Northern* and *Marrero* contained statute-specific saving clauses, the Supreme Court did not limit implied repeals to that instance.

[5] District Courts within the Third Circuit have

11

Although Dixon points to legislative history and statements from members of Congress to support his argument, there is no need to rely on these sources. Congress's intent is discernable from the text of the Act itself. First, Congress's emergency directive to the Sentencing Commission in Section 8 to "make such conforming amendments" that would "achieve consistency with other guideline provisions and applicable law" demonstrates that Congress wanted the mandatory minimums in the FSA to apply to sentences handed down as of its effective date. "Applicable law" must be the FSA, not the 1986 Act, because

---

misinterpreted our decision in *United States v. Jacobs*, 919 F.2d 10 (3d Cir. 1990), as requiring an express statement of retroactivity and prohibiting consideration of congressional intent in deciding whether to apply the FSA to defendants in Dixon's position. *See*, *e.g.*, *United States v. Dickey*, 759 F. Supp. 2d 654, 659-60 (W.D. Pa. 2011); *United States v. Burgess*, No. 09-150, 2010 WL 5437265, at *2 (W.D. Pa. Dec. 27, 2010); *United States v. Crews*, 755 F. Supp. 2d 666, 671 (W.D. Pa. 2010). In *Jacobs*, the defendant argued that the legislative history of the repealed statute should be relevant to whether the new statute saved the old penalty. *See* 919 F.2d at 12. Rejecting this argument, *Jacobs* made clear that the legislative history of the *repealed* law was of no relevance to the analysis. *See id.* at 13. Instead, the proper point of reference is the repealing statute. *Jacobs* did not hold that an express statement regarding retroactivity was required. Further, the decision did not address the "necessary implication" analysis and is no bar to concluding that the FSA applies to Dixon.

Congress sought to bring the Guidelines in conformity with the 18:1 ratio in the FSA. As such, during the time period when the Sentencing Commission revised the Guidelines, the FSA provided the "applicable law" against which those amendments were modeled.

Significantly, the Sentencing Reform Act of 1984 prompts district courts to apply the Guidelines "in effect on the date the defendant is sentenced[.]" 18 U.S.C. § 3553(a)(4)(A)(ii). Legislating against this backdrop, Congress knew that the amended Guidelines would apply at the date of sentencing, regardless of when the offense occurred. Section 8 of the Act speaks of promoting "consistency" between the Guidelines and the statute. FSA § 8. This evinces an intent to apply the FSA to sentences given as of its effective date, just as the Guidelines would be. The mandate in Section 8 would not make sense if the new mandatory minimums are not in accord with the Guidelines because, regardless of the Commission's actions, the old mandatory minimums would always trump the new Guidelines for the large number of defendants whose Guidelines ranges are below the mandatory minimum. *See* U.S.S.G. § 5G1.1(b) ("Where a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence."). The Eleventh Circuit in *Rojas* also recognized the mismatch that occurs when failing to apply the Act in this instance, namely, "the necessary and fair implication of the FSA is that Congress intended the Act to apply to all sentencings going forward, because a contrary

13

conclusion would be logically inconsistent and would achieve absurd results[.]" 2011 WL 2623579, Slip Op. at 10.

The Seventh Circuit in *Fisher* disagreed with this analysis, noting that "if Congress wanted the FSA or the guideline amendments to apply to not-yet-sentenced defendants convicted on pre-FSA conduct, it would have at least dropped a hint to that effect somewhere in the text of the FSA, perhaps in its charge to the Sentencing Commission." 635 F.3d at 339-40. This reasoning, however, ignores the text of Section 8 and fails to meaningfully explain why Congress would direct new Guidelines to be employed on an emergency basis, yet at the same time would desire that the Guidelines have a diminished impact due to the continued application of the old mandatory minimums. Refusing to apply the mandatory minimums in the FSA eviscerates the very consistency and conformity that the statute requires. In other words, the Guidelines cannot "conform[]" and "achieve consistency" with the FSA if the Act does not apply to all sentencing proceedings as of August 3, 2010. This leads to an incongruous result that puts district courts in the odd position of having to apply Guidelines implemented to "achieve consistency with . . . applicable law" to cases in which the "applicable law" was not applicable. The directive to the Sentencing Commission signifies that Congress desired congruence between the FSA and the Guidelines.

Moreover, Congress's "emergency" directive is unnecessary if it did not intend to apply the FSA immediately because the old mandatory minimums would still control in many cases. *See Fisher*, 2011 WL 2022959, at *2 (Williams and Hamilton, JJ., dissenting from the denial of rehearing and

14

rehearing en banc) ("Congress's mandate in section 8 would not have made much sense if Congress did not intend the FSA to apply to defendants in Dorsey's situation because, regardless of what the Commission promulgated, the new guidelines would simply look to the old statutory minimums."). The urgency Congress expressed through ordering the Sentencing Commission to promulgate new Guidelines demonstrates its intent to apply the FSA without delay. The *Rojas* Court echoed this conclusion. *See* 2011 WL 2623579, Slip Op. at 10 ("By granting the Sentencing Commission the emergency authority to amend the Sentencing Guidelines by November 1, 2010, Congress necessarily indicated its intent for the FSA to apply immediately."). Continuing to apply the repealed mandatory minimums in the 1986 Act is directly in tension with Congress's emergency dictate, and, we believe, an erroneous reading of the statute.

And, notably, the statute of limitations for drug offenses is five years. 18 U.S.C. § 3282(a). Refusing to apply the FSA to defendants like Dixon would lead to a troubling result in which the Act would have little real effect for years, until the statute of limitations runs on pre-August 3, 2010 conduct. For example, a defendant could be indicted on August 2, 2015, for conduct occurring on August 2, 2010, and still be subject to the mandatory minimum penalties that Congress sought to eradicate by "restor[ing] fairness to Federal cocaine sentencing" in 2010. FSA, Preamble. Congress could not have intended such a bizarre outcome. Indeed, "[i]t seems unrealistic to suppose that Congress strongly desired to put 18:1 guidelines in effect by November

15

1 even for crimes committed before the FSA but balked at giving the same defendants the benefit of the newly enacted 18:1 mandatory minimums." *Douglas*, 2011 WL 2120163, at *4. Although district courts have been divided on the issue, many have likewise agreed that the FSA applies to defendants similarly situated to Dixon. *See United States v. Watts*, -- F. Supp. 2d --, 2011 WL 1282542, at *11 (D. Mass. Apr. 5, 2011) (collecting cases).

Second, Congress's direction to the Sentencing Commission in Section 10 to study the effects of the FSA drives home the point. If the FSA's provisions only apply to post-August 3, 2010 conduct, defendants sentenced in the coming years will be subject to the mandatory minimums in the 1986 Act. Consequently, during the time period in which the Sentencing Commission is supposed to produce a report on the effects of the FSA, the Act often will be inapplicable. This anomaly frustrates the ability of the Sentencing Commission to compile a report on the impact of changes as a result of the FSA. Why would Congress commission a study on a statute during a period in which it would not consistently apply? This report "would be incomplete, at best, and incomprehensible, at worst, if the FSA were not yet being uniformly applied until after the report was due." *United States v. Brown*, No. 10-0135, 2011 WL 2457933, at *3 (W.D. Pa. June 16, 2011).

Finally, the title and stated purpose of the FSA confirm that Dixon should be sentenced according to its terms. In plainly seeking to "restore fairness" to sentencing, Congress intended to apply the Act to all sentences rendered as of the Act's passage. Declining to do so begs the question of "what

16

possible reason could there be to want judges to *continue* to impose new sentences that are not 'fair' over the next five years while the statute of limitations runs?" *United States v. Douglas*, 746 F. Supp. 2d 220, 229 (D. Me. 2010) (emphasis in original). District courts have struggled mightily with the prospect of perpetuating a sentencing regime that Congress has explicitly decried as unjust. *See*, *e.g.*, *Watts*, 2011 WL 1282542, at *1 ("It is disturbing enough when courts, whose primary task is to *do* justice, become themselves the instruments of injustice . . . But this discomfort reaches its zenith when the injustice has been identified and formally remedied by Congress itself." (emphasis in original)); *United States v. Elder*, No. 1:10-CR-132, 2011 WL 294507, at *6 (N.D. Ga. Jan. 27, 2011) ("For the Court to continue to impose sentences that are contrary to the statute that Congress itself described as 'An Act to restore fairness to Federal cocaine sentencing' would be an absurd result."). This sentiment is well-founded, as refusing to apply the FSA is, indeed, fundamentally unfair. There is no compelling reason to reach a contrary conclusion. Because the "plain import of a later statute," here, the FSA, "directly conflicts with an earlier statute," namely, the Saving Statute's attempted preservation of the mandatory minimum penalties in the 1986 Act, the FSA controls "*regardless* of its compliance with any earlier-enacted requirement of an express reference or other 'magical password.'" *Lockhart*, 546 U.S. at 149 (Scalia, J., concurring) (emphasis in original).

III.

We hold that the FSA requires application of the new mandatory minimum sentencing provisions to all defendants

17

sentenced on or after August 3, 2010, regardless of when the offense conduct occurred. "[T]he terms of the law as a whole," *Great N. Ry.*, 208 U.S. at 465, namely the Act's grant of emergency authority to the Sentencing Commission and the desire to achieve "consistency" through "conforming" amendments, in conjunction with the directive in the Sentencing Reform Act of 1984 to apply the Guidelines in effect on the day of sentencing, lead to the inescapable conclusion that Congress intended to apply the FSA to Dixon. This interpretation of the Act comports with its stated purpose to restore fairness to federal cocaine sentencing. To conclude otherwise would frustrate this goal and set "the legislative mind . . . at naught." *Id.* Accordingly, we will vacate the judgment of the District Court and remand so that Dixon may be sentenced in accordance with the terms of the FSA.

18