In the

# United States Court of Appeals
### For the Seventh Circuit

Nos. 11-1558, 11-1559, 11-1586 & 11-1758

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

*v.*

CHRISTOPHER HOLCOMB, *et al.*,

*Defendants-Appellees*.

Appeals from the United States District Court
for the Central District of Illinois.
Nos. 3:10-cr-30058-RM-BGC *et al.*—**Richard Mills**, *Judge*.

DECIDED AUGUST 24, 2011

Before EASTERBROOK, *Chief Judge*, and POSNER, FLAUM, KANNE, ROVNER, WOOD, WILLIAMS, SYKES, TINDER, and HAMILTON, *Circuit Judges*.

A member of this court called for a vote on the question whether these four appeals should be heard en banc on the court's own initiative. A majority of the active judges did not vote in favor of rehearing en banc, and the proposal therefore fails. Petitions for rehearing or rehearing en banc will not be accepted; this decision is the court's final judgment. Three members of the court have written opinions explaining their votes.

EASTERBROOK, *Chief Judge*, with whom FLAUM, KANNE, SYKES, and TINDER, *Circuit Judges*, join. These four appeals were filed by the United States with the Solicitor General's authorization. Eight days after the United States prevailed, the prosecutor filed a document styled "Notice of Changed Position" announcing that the Attorney General disagrees with this court (and apparently with the Solicitor General too). The "Notice of Changed Position" does not ask us to do anything in particular, but some members of the court believe that we should grant rehearing en banc and overrule *United States v. Fisher*, 635 F.3d 336 (7th Cir. 2011), which led our panel to decide these four appeals in the prosecutor's favor. I am content to leave *Fisher* undisturbed.

The Attorney General's "Memorandum for all Federal Prosecutors", dated July 15, 2011, directs United States Attorneys to argue that the Fair Sentencing Act of 2010, Pub. L. 111-220, 124 Stat. 2372 (2010), applies to all criminal prosecutions in which sentence was imposed on or after August 3, 2010, the day the President signed the bill. The Memorandum also directs United States Attorneys to argue that the 2010 Act does not apply to cases in which sentence was pronounced on August 2, 2010, or earlier, even if they were pending in the district court or appeal on August 3. In other words, the Attorney General has concluded that the 2010 Act is partially retroactive.

As far as I am aware, the Supreme Court has never held any change in a criminal penalty to be partially retroactive. The choice always has been binary: retroac-

tive or prospective. And what makes application "retroactive" is a change in the legal consequences of activity that predates the new law's enactment. See generally *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), which discusses what it means for application of a new statute to be retroactive, and the two exceptions to the presumption against retroactivity: new procedural rules and new jurisdictional requirements. The 2010 Act does not affect judicial procedure; it changes the penalty for criminal conduct. And it does not affect jurisdiction.

The common law distinguished increases in criminal punishments from reductions or repeals. Any law that repealed a criminal statute or reduced the defendant's punishment was fully retroactive, while in light of the Constitution's Ex Post Facto Clause a law creating a crime or increasing criminal punishment could apply only to conduct that occurred after the law changed. But in 1871 Congress enacted the General Saving Statute, now codified as 1 U.S.C. §109, which makes all changes prospective unless the new statute provides otherwise. *Warden v. Marrero*, 417 U.S. 653, 659–61 (1974), discusses this history. Section 109 provides:

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

Defendants argued that §109 is irrelevant to the 2010 Act, because it reduces rather than "repeals" the penalties for crack cocaine. They also contended that a criminal does not "incur" a punishment until sentenced. Every circuit has concluded, to the contrary, that a law reducing criminal punishment is a repeal of the old statute and the enactment of a new one for the purpose of §109, and that a punishment is incurred when the crime is committed. *Marrero* supports both of these conclusions. Our precedent is *United States v. Bell*, 624 F.3d 803, 814–15 (7th Cir. 2010), which holds that §109 makes the 2010 Act prospective, because it lacks an express declaration of retroactivity. A footnote collects other circuits' equivalent decisions.[†]

*Bell* and the other circuits rejected arguments for retroactivity made by defendants whose appeals were pending on August 3, 2010. That's why courts could decide the question so quickly. A second wave of defendants, those sentenced on or after August 3, 2010, asked for partial retroactivity. Our circuit was the first to con-

---

[†] *United States v. Goncalves*, 642 F.3d 245 (1st Cir. 2011); *United States v. Acoff*, 634 F.3d 200 (2d Cir. 2011); *United States v. Reevey*, 631 F.3d 110 (3d Cir. 2010); *United States v. Rhodes*, 2011 U.S. App. Lexis 10238 (4th Cir. May 20, 2011) (one of at least five opinions in that circuit, all non-precedential); *United States v. Doggins*, 633 F.3d 379 (5th Cir. 2011); *United States v. Carradine*, 621 F.3d 575 (6th Cir. 2010); *United States v. Brewer*, 624 F.3d 900 (8th Cir. 2010); *United States v. Baptist*, 2011 U.S. App. Lexis 11056 (9th Cir. June 2, 2011); *United States v. Lewis*, 625 F.3d 1224 (10th Cir. 2010); *United States v. Gomes*, 621 F.3d 1343 (11th Cir. 2010). The D.C. Circuit has yet to address this subject.

sider that possibility. The panel in *Fisher* rejected the argument that the date of sentencing matters. If the 2010 Act is retroactive, then it applies to all pending cases no matter how far they have got in the judicial system; if it is not retroactive, then it applies only to crimes committed on or after August 3, 2010. Nothing depends on the sentencing date, which reflects how long it took to catch a criminal, and the state of the district judge's calendar, rather than principles of deterrence or desert. Section 109 says that the former law "shall be treated as still remaining in force" for pre-amendment conduct. If the old law is "treated as still remaining in force", the new law can't be applied to persons newly sentenced for pre-amendment crimes; §109 forecloses partial retroactivity.

*United States v. Douglas*, 644 F.3d 39 (1st Cir. 2011), reached a contrary conclusion, apparently unaware that it was creating a conflict with *Fisher*, which had been issued 20 days earlier. *Douglas* held that the new minimum and maximum sentences take effect for defendants sentenced on and after November 1, 2010. (I'll come back to the source of that date.) *United States v. Rojas*, 2011 U.S. App. LEXIS 13677 (11th Cir. July 6, 2011), then misread *Douglas* as holding that the new rules take effect with sentencing on and after August 3, 2010, and applied that transition date. (Rojas was sentenced on August 3 and would not have been eligible for a lower sentence under *Douglas*.) On July 7 our panel in *Holcomb* remanded four cases with instructions to apply *Bell* and *Fisher*. And on July 15 the Attorney General issued his memorandum agreeing with *Rojas*. That led to the United States Attorney's "Notice of

Changed Position" in the four appeals this circuit had decided on July 7. Then *United States v. Dixon*, 2011 U.S. App. LEXIS 16374 (3d Cir. Aug. 9, 2011), followed *Rojas* without explaining why it chose August 3 rather than November 1 as the transition date. Most recently, *United States v. Sidney*, 2011 U.S. App. LEXIS 16421 (8th Cir. Aug. 10, 2011), agreed with *Fisher* and concluded that §109 does not permit partial retroactivity.

When the Executive Branch confesses error, this circuit gives respectful consideration to the rationale for the new position. A recent example is *United States v. Corner*, 598 F.3d 411 (7th Cir. 2010) (en banc), which overruled several of the circuit's decisions after the Solicitor General filed a brief carefully explaining where the circuit had gone wrong. That explanation carried the day; *Corner* was unanimous. Unfortunately, the Attorney General's "Memorandum for all Federal Prosecutors" lacks the sort of analysis that was so helpful in *Corner*. The Memorandum does not discuss §109 or the language of the 2010 Act. It does not explain why *partial* retroactivity is appropriate—or why the transition should depend on the date of sentencing rather than some other event, such as a guilty plea or appeal. The Attorney General does quote from the caption of S. 1789, which describes the proposal as "A bill to restore fairness to Federal criminal sentencing", but this language precedes the enacting clause and is not part of the United States Code. It also is unhelpful in evaluating a proposal for retroactive application. *Every* law lowering sentences expresses a legislative conclusion that sentences had been excessive. The common law responded by applying penalty reductions retroactively. But §109

provides otherwise. The observation that Congress, the President, and many federal judges think the former rules excessively severe does not distinguish the 2010 Act from any other law reducing sentences and does not justify disregarding the anti-retroactivity norm created by §109.

*Douglas* asked what reason there could be to continue imposing sentences that the 2010 Act condemns as excessive. The same question could be asked about every other law that reduces criminal sentences. The answer must be that §109 itself supplies the reason. It tells us that statutory lenience does not reduce the punishment for acts completed before the new law took effect. Perhaps the common law reflects greater wisdom than does §109, but Congress has displaced the common law.

Although §109 says that only an "express" provision in a later statute can support retroactivity, Congress is entitled to change that rule just as it is entitled to change the punishment for distributing crack cocaine. The legislature of 1871 can't tie the hands of the legislature sitting in 2010. This may be why the Court suggested in *Marrero* that a "fair implication" in a new law could allow retroactive application. 417 U.S. at 659 n.10. An earlier decision, *Great Northern Ry. v. United States*, 208 U.S. 452, 465 (1908), said that when a new law "by necessary implication" applies to pre-enactment crimes, the courts must follow the newer law rather than §109. A necessary (or fair) implication falls short of an express provision but could show that Congress has amended §109 to that extent. Still, unless superseded, §109

is as authoritative as other rules found in the Dictionary Act, 1 U.S.C. §§ 1–8, and in 18 U.S.C. §§ 5–27. Definitions, presumptions, and presets are essential to understanding legal texts. They are subject to revision, but a court should not lightly infer that Congress has tossed out all the framework laws that facilitate interpretation—and thus facilitate legislation too, by giving the legislature a formulary to use. See, e.g., *Rowland v. California Men's Colony*, 506 U.S. 194 (1993) (holding that the context clause in the Dictionary Act allows departure from the presumptive definitions only if there is no other plausible linguistic understanding of the new statute). See also *Kentucky Association of Health Plans, Inc. v. Miller*, 538 U.S. 329 (2003) (enforcing the rule in the McCarran-Ferguson Act that only federal laws expressly applying to insurance supersede state regulatory schemes).

Neither the Attorney General nor any member of this court believes that the 2010 Act is fully retroactive. To say that the 2010 Act is not fully retroactive is to say that Congress did *not* supersede §109, expressly or by implication. Section 109 forecloses partial retroactivity by providing that the former law "shall be treated as still remaining in force" for pre-amendment conduct. If §109 has not been superseded, what is the justification for partial retroactivity? The Attorney General, like the first, third, and eleventh circuits, is silent on that subject.

Some of my colleagues believe that support for partial retroactivity can be found in §8 of the 2010 Act, which provides:

The United States Sentencing Commission shall—

> (1) promulgate the guidelines, policy statements, or amendments provided for in this Act as soon as practicable, and in any event not later than 90 days after the date of enactment of this Act, in accordance with the procedure set forth in section 21(a) of the Sentencing Act of 1987 (28 U.S.C. 994 note), as though the authority under that Act had not expired; and

> (2) pursuant to the emergency authority provided under paragraph (1), make such conforming amendments to the Federal sentencing guidelines as the Commission determines necessary to achieve consistency with other guideline provisions and applicable law.

A requirement for a change in Guidelines within 90 days of the new law's enactment does not imply anything about minimum and maximum sentences on August 3, 2010. The new Guidelines came into effect on November 1, 2010. This is the source of the date that *Douglas* chose. The first circuit thought it would be incongruous if the new Guidelines, but not the new minimum and maximum sentences, applied to defendants sentenced on or after November 1, 2010. This does not support the Attorney General's view that August 3 marks the transition. Putting the statutory changes into effect while the Commission was still deliberating would be just as incongruous as putting the Guidelines but not the new

minimum and maximum penalties into effect. Yet none of my colleagues concludes that the rules change for sentences on November 1, 2010, or for that matter November 1, 2011—when the 2010 Guidelines will be given retroactive effect. See Sentencing Commission Release of July 1, 2011, making Amendment 750, which implemented the 2010 Act, retroactive as of November 1, 2011. (The Commission's authority to apply new Guidelines to closed cases comes from 18 U.S.C. §3582(c)(2). See *Dillon v. United States*, 130 S. Ct. 2683 (2010).)

A reader might be inclined to ask why the 2010 Act's changes to minimum and maximum sentences should not take effect on November 1, 2010, the same date as the revised Guidelines—for revised Guidelines apply to new sentences even if the conduct took place years earlier. See 18 U.S.C. §3553(a)(4)(A)(ii); *United States v. Demaree*, 459 F.3d 791 (7th Cir. 2006). There is no inconsistency however, because the Guidelines and the 2010 Act are doing different things. The statute that provides penalties for cocaine and cocaine base, 21 U.S.C. §841(b), sets minimum and maximum punishments; the Guidelines then influence where within that range the judge imposes sentence. The 2010 Act amended §841(b). Judges are free to disagree with the Commission, see *United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 552 U.S. 85 (2007), but they are not free to disagree with Congress. Thus we have two retroactivity dates. One is when the new minimum and maximum penalties take effect; the other is when the revised Guidelines take effect. The Commission has, and has used, statutory authority to apply the lower Guidelines even

to closed cases starting November 1, 2011. The Commission lacks any equivalent authority to make different statutory minimum and maximum sentences applicable to cases in which the criminal conduct predated August 3, 2010.

These four appeals are about the retroactivity of the changes to the statutory minimum and maximum sentences, not about the amended Guidelines. And this is why §8 of the 2010 Act does not affect these appeals. Changes to the Guidelines have nothing to do with minimum and maximum sentences. That was settled in *Neal v. United States*, 516 U.S. 284 (1996), which the Court reaffirmed in *Kimbrough* and *DePierre v. United States*, 131 S. Ct. 2225 (2011). When the Commission dramatically lowered the Guideline ranges for LSD, defendants argued that it would be preposterous to apply the new Guidelines (which do not count the weight of the carrier medium) while leaving unchanged the statutory minimum, which *Chapman v. United States*, 500 U.S. 453 (1991), holds does count the carrier's weight. *Neal* held, however, that the statute and the Guideline are unconnected and that arguments about incongruity do not justify modifying the statutory minimum and maximum sentences.

The ratio in the Guidelines has not been 100:1 since 2007. That year, the Sentencing Commission dropped most cocaine-base sentences by two levels. See Amendment 706, effective November 1, 2007 (and made retroactive by Amendment 713 as of March 3, 2008). The result of the 2007 change was a ratio that, depending on quantity,

could be as low as 25:1 or as high as 80:1. For many of-
fenders the further change in 2010 does not matter. No
one who distributes 8.4 kilograms or more of cocaine
base received a lower Guideline range. Many common
quantities have the same base offense level before and
after the 2010 change to U.S.S.G. §2D1.1. For example,
the level for distributing 1 kilo dropped from 36 to 34
in 2007 but stayed at 34 in 2010. Some defendants
receive a benefit from both revisions: the level for 100
grams of crack fell from 30 to 28 in 2007 and to 26 in
2010. My point is not that the 2010 changes are slight
for everyone—the benefit can be large for persons
who distribute small quantities (the level for 5 grams
drops from 24 to 16)—but that the Guidelines abandoned
the 100:1 ratio in 2007, not 2010. Neither in 2007 nor in
2010 did Congress link the time of change in the Guide-
lines' ratio to the time of change in the minimum and
maximum penalties.

Section 8, which tells the Commission to get a move
on in revising its Guidelines, does not imply anything
about when the new minimum and maximum sentences
go into force. Because for some quantities the difference
between the 2007 and 2010 quantity tables is small
or nonexistent, one effect of the rapid revision is to in-
crease penalties swiftly for the most serious offenders
(and to increase the difference between the penalties
for the worst offenders and the least serious ones)—as
sections 5 and 6 of the 2010 Act call for higher Guide-
lines when certain aggravating factors are present, while
§7 directs the Sentencing Commission to reduce the
punishment for offenders with minimal roles. Those
changes are unrelated to the crack/powder ratio.

Section 10 of the 2010 Act tells the Sentencing Commission to study the effects of the new legislation and report within five years. *Dixon* observed that, unless the new legislation applies retroactively, the study will be limited to the law's effect on persons who distribute cocaine base after August 2, 2010. So? There will be plenty of people in that category. The point of such a study is to ascertain how lower penalties affect the volume of crime. People who distributed cocaine before the 2010 Act expected to be subject to the old penalty structure; their behavior cannot be changed by a later drop in sentences. A study of the 2010 Act's effects will produce meaningful results only if limited to persons whose criminal conduct occurs while the 2010 Act is in force. I do not think that §10 supplies much footing for an inference one way or the other, but, if §10 is relevant, *Dixon* got things backward.

Thoughtful people might wonder what sense it makes for Congress, having decided that a 100-to-1 ratio is excessive, to leave the minimum and maximum sentences alone for persons whose crimes predate August 3, 2010. It is a good question, to which there is no satisfactory answer other than the observation that legislation is an exercise in compromise. Some legislators supported the existing 100-to-1 ratio between cocaine base and powder cocaine, while others thought that the two versions of this drug should be treated the same, as the Sentencing Commission once recommended.[‡] Some

---

[‡] The 100-to-1 ratio was created by legislation in 1986. In 1990 Congress directed the Sentencing Commission to study the

(continued...)

members of Congress wanted to reduce the disparity by raising the penalties for powder cocaine; others wanted to address it by reducing the penalties for crack. Members of Congress compromised at a ratio of 18 to 1, with most change coming through reductions in minimum and maximum terms of imprisonment.

There's no scientific basis for the 18-to-1 ratio, or for getting there by reducing crack sentences rather than increasing powder sentences, but it was the best that the advocates of parity could achieve (or, equivalently, the most that other legislators would concede). I don't mean by this that the 18:1 ratio is irrational, only that it is

---

(...continued)

subject. The Commission has issued four reports, each making a different proposal. See *Cocaine and Federal Sentencing Policy* (Feb. 1995) (proposing 1:1); *Cocaine and Federal Sentencing Policy* (Apr. 1997) (recommending 5:1); *Cocaine and Federal Sentencing Policy* (May 2002) (recommending ratio of "at least" 20:1; *Cocaine and Federal Sentencing Policy* (May 2007) (recommending 20:1 or less). Until 2010 Congress did nothing in response to these reports, except that in 1995 it blocked proposed changes that would have made the Guidelines' ratio 1:1. In 2007, however, Congress allowed the Commission to change the ratio in the Guidelines by reducing most cocaine-base ranges by two offense levels, while the statutory minimum and maximum sentences continued to reflect a 100:1 ratio. *Kimbrough* summarizes this history. 552 U.S. at 94–100. That it took 24 years to change the much-criticized 100:1 ratio in §841(b)—and that three sections of the 2010 Act call for higher penalties for some drug distributors—demonstrates the difficulty of creating a package that can attract majority support.

arbitrary, in the same sense that a statute of limitations is arbitrary. (Why 90 or 270 days for employment-discrimination suits, 2 years for claims under the Federal Tort Claims Act, 4 years for the residual statute in 28 U.S.C. §1658, and 5 years for most federal felonies?) Many Members of Congress who wanted parity also favored retroactivity, and Members who supported a higher ratio also favored no retroactivity. One way proponents of this law could achieve a lower ratio was to give up on retroactivity. The ratio, and retroactivity, are among the several dimensions of this compromise.

Most legislative deals are struck off the floor. I do not claim inside knowledge about this one. Perhaps I err in guessing about how this law came to have an 18:1 ratio and to allow the Sentencing Commission to implement retroactive Guidelines. I broach this subject only to say why I do not find persuasive an argument along the lines of: "The revised Guidelines were in place by November 1, 2010, so the new minimum and maximum penalties must apply to at least *some* persons whose crimes occurred before August 3, 2010." That theme disregards the compromise nature of legislation.

When Congress enacts a bill, a majority agrees on its text, not on grand principles. Neither side got everything it wanted in this statute, and judges disserve the legislative process by giving one side more than it secured at the bargaining table. Indeed, the tendency to provide one side with "just a little more in the right direction" can make legislation harder to accomplish by requiring Congress to take up, and resolve, all of the

ways in which the judiciary might be tempted to tinker. "[N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (emphasis in original). For all we can know, a belief in Congress that the judiciary would make the law partially retroactive would have stiffened the opposition to the bill, and the 100:1 ratio would still be in force today.

Choosing an effective date for new legislation can be as arbitrary as deciding how many grams of cocaine hydrochloride receive the same treatment as one gram of cocaine base. The Attorney General relies heavily on the word "fair" in the title of the Fair Sentencing Act, but what's fair about condemning someone sentenced on August 2 to more time in prison than a person sentenced the next day, even though they committed their crimes on the same date (and may have been co-conspirators)? Suppose comrades in crime distribute cocaine in mid-2009 and are caught promptly. One confesses, pleads guilty, and testifies at the trial of the other, who fights tooth and nail and falsely denies culpability. The first is sentenced on August 1, 2010, the second on September 1. How would it be "fair" (or even conscionable) to give the lower sentence to the person who refused to accept responsibility for his crimes,

just because by dragging out the process that person was sentenced after August 2?

It would be weird to conclude that, the longer it takes to issue an indictment, or the better the offender at evading capture, and hence the later the sentencing date, the lower the sentence. Why should the changes in the minimum and maximum terms take effect before the changes in the Guidelines (November 1, 2010)? *Rojas*, *Dixon*, and the Attorney General do not even try to explain why they chose August 3 rather than November 1 as the transition date. Why change the rules as of the date of sentencing rather than the date of arraignment, plea, or trial, the date the appeal is decided, or some other event? Any of those transition dates would produce incongruities. Only full retroactivity, or no retroactivity, treats equal criminal conduct equally.

If the President wants to apply the lower minimum and maximum penalties to all cases, pending and closed, he has only to issue a general commutation. The pardon power permits the President to achieve retroactive lenience if he is willing to pay the political price. By contrast, the judiciary must implement compromises faithfully, even when most judges wish that the political decision had been different. I have therefore voted not to hear these appeals en banc.

WILLIAMS, *Circuit Judge*, with whom POSNER, ROVNER, WOOD, and HAMILTON, *Circuit Judges*, join, dissenting from the denial of rehearing en banc. The sentences Congress had originally mandated for crack cocaine offenses premised on drug quantities that were one hundred times lower than those for powder cocaine offenses are indefensible. There is no debate about that. Recognizing this, Congress wiped them out in the Fair Sentencing Act of 2010 to, in its own words, "restore fairness in Federal cocaine sentencing" by eliminating the 100:1 mandatory minimums. The only question in this case, odd as it might sound, is whether Congress wanted everyone sentenced after the Fair Sentencing Act became law to receive a "fair" sentence, or just some.

Our circuit should have heard this case en banc. Three other circuits have ruled that judges no longer must impose unfair sentences after the Fair Sentencing Act. This issue affects pending cases and many cases to come in light of the five-year statute of limitations on drug prosecutions. There were equal votes to grant and deny rehearing en banc. So our circuit's law stands, and it is wrong.

I.

Anthony Clardy was sentenced after the Fair Sentencing Act became law. The quantity of crack cocaine involved was too small to trigger a mandatory minimum under the Fair Sentencing Act ("FSA"), and the judge imposed a sentence of 33 months' imprisonment.

The United States government, exercising the discretion to appeal sentences that it has, argued to us that Clardy should be sentenced to the higher pre-FSA mandatory minimum because the drug deal happened before the FSA's passage. For Clardy, that would mean a sentence of 120 months in prison. That sentence is so lengthy, and is so out of line with what the experienced sentencing judge thought the proper sentence should be, because it is premised on the 100-to-1 crack to powder ratio that has been acknowledged to be baseless.

If the FSA applies to him, then, Anthony Clardy will serve a 33-month sentence. If it does not, his sentence will soar to 120 months. Perhaps this difference sounds overly dramatic, or leads one to think that the sentencing judge must have initially imposed a light sentence. That would be wrong. The United States Sentencing Guidelines advised a sentence of 30 to 37 months' imprisonment here. The judge sentenced Clardy right in the middle.

## II.

We consolidated the government's appeal of Clardy's sentence with its appeals in three other cases, all involving defendants who committed crimes before the FSA became law on August 3, 2010, but who were sentenced after that and under its terms. Each had an amount of crack cocaine that triggered a mandatory minimum under the old law that was less than an increased triggering amount under the FSA. In light of our ruling in *United States v. Fisher*, 635 F.3d 336 (7th

Cir. 2011), *reh'g en banc denied*, 2011 WL 2022959 (7th Cir. May 25, 2011), a panel of our court agreed with the government, vacated the sentences imposed by the district judge, and said the pre-FSA mandatory minimums must apply to each person. *See* Nos. 11-1558, et al., *United States v. Holcomb*, et al., Order (7th Cir. July 7, 2011).

Now the United States government has changed its position. Completely. On July 15, 2011, the United States Attorney General issued a memorandum stating he has "concluded that the law requires the application of the Act's new mandatory minimum sentencing provisions *to all sentencings that occur on or after August 3, 2010, regardless of when the offense conduct took place*." (emphasis added). The Attorney General directs prosecutors to act accordingly and concludes:

> I am taking this position because it is required by the law and our mandate to do justice in every case. The goal of the Fair Sentencing Act was to rectify a discredited policy. I believe that Congress intended that its policy of restoring fairness in cocaine sentencing be implemented immediately in sentencings that take place after the bill was signed into law.

The United States government is not alone. The First Circuit ruled after us, even before the Attorney General's memorandum, that the FSA was not limited to defendants whose conduct occurred after its passage. *United States v. Douglas*, 644 F.3d 39 (1st Cir. May 1, 2011). So did the Eleventh Circuit. *United States v. Rojas*, 2011 WL 2623579 (11th Cir. July 6, 2011). The Third Circuit

has recently followed. *United States v. Dixon*, ___ F.3d ___, 2011 WL 3449494 (3d Cir. Aug. 9, 2011). Only the Eighth Circuit has declined to apply the FSA to crack offenders sentenced after its passage. *United States v. Sidney*, ___ F.3d ___, 2011 WL 3477200 (8th Cir. Aug. 10, 2011).

Attaching the Attorney General's memorandum, the government filed a Notice of Changed Position informing us of its new position regarding these four defendants. It has done the same thing in other cases as well. Despite the government's position that the FSA applies in sentencings after its passage including these, the law of our circuit remains the same.

There is an unfilled vacancy on our court, so we have an equal number of active judges. Half of the active judges on this court, including the two who were on the original panel in *Fisher*, voted to rehear these consolidated cases en banc. Indeed, the changes in the landscape that have taken place after our ruling are significant. Certainly our obligation is to evaluate the merits of the statute ourselves, but the government's "confessions of error are, of course, given great weight." *Sibron v. New York*, 392 U.S. 40, 58 (1968); *accord Young v. United States*, 315 U.S. 257, 258-59 (1942).

But half does not a majority make, and so it is not enough to obtain a rehearing en banc in our court. I believe our circuit should reexamine its position, especially in light of the events since our initial decision, and that it should do so because our position is wrong. For the reasons I explained in my dissent from the denial of rehearing en banc in *Fisher*, 2011 WL 2022959, along

with those I explain here, I dissent from the denial of rehearing en banc.

III.

The heightened mandatory minimums for crack cocaine offenses were based on false assumptions. The Sentencing Commission knows this. *See* United States Sentencing Commission, *Report to Congress, Cocaine and Federal Sentencing Policy* (May 2002) ("The 100-to-1 drug quantity was established based on a number of beliefs about the relative harmfulness of the two drugs and the relative prevalence of certain harmful conduct associated with their use and distribution that more recent research and data no longer support."). The United States Attorney General knows this. *See* Statement of the Attorney General on the Passage of the Fair Sentencing Act, July 28, 2010, *available at* http://www.justice.gov/opa/pr/2010/July/10-ag-867.html ("The bill greatly reduces the unwarranted disparity in sentences for crack and powder cocaine offenses"). Congress knows this. *See, e.g.,* 156 Cong. Reg. 1680 (Mar. 17, 2010) (statement of Sen. Durbin, FSA's author, on day it passed the Senate) ("Every day that passes without taking action to solve the problem is another day that people are being sentenced under a law that virtually everyone agrees is *unjust* . . . . If this bill is enacted into law, it will *immediately* ensure that every year, thousands of people are treated more fairly in our criminal justice system.") (emphasis added). And so Congress passed the Fair Sentencing Act of 2010, which became law when the

President signed it on August 3, 2010 surrounded by bipartisan Congressional leaders and the Attorney General.

Upon that signature, I believe the Fair Sentencing Act's lower mandatory minimums for crack cocaine offenders applied to all defendants sentenced after it. The only real argument against such a reading stems from the general saving statute, 1 U.S.C. § 109, which Congress passed after an 1871 Supreme Court decision. When the offense in the case was committed, it carried a $500 to $1000 fine or a prison term of three to five years. After the defendant's indictment but before trial, Congress amended the penalty provision to a $300 to $1000 fine and one to five years in prison. The Supreme Court reasoned that because the penalty provisions of the two statutes conflicted, the new statute operated as a repeal of the earlier one. It held as a result that "all criminal proceedings taken under [the old statute] fell" because, it said, "[t]here can be no legal conviction, nor any valid judgment pronounced upon conviction, unless the law creating the offence be at the time in existence." *United States v. Tynen*, 78 U.S. 88, 95 (1871). It then directed that the indictment be dismissed. *Id.*

Congress passed the general saving statute in response, repealing the common-law presumption. Passing the statute made sense in that context. *See Hamm v. City of Rock Hill*, 379 U.S. 306, 314 (1964) ("It was meant to obviate mere technical abatement such as that illustrated by the rule in *Tynen*."). In relevant part, the saving statute provides:

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.1 U.S.C. § 109.

The saving statute, then, ensures that pre-existing penalties continue, unless Congress later directs otherwise.

Before its change of position, the government used to point us to a Supreme Court saving clause case, *Warden, Lewisburg Penitentiary v. Marrero*, 417 U.S. 653 (1974). There, the Court ruled against a prisoner long-ago sentenced who sought to benefit from a new statute making persons convicted of his offense parole eligible, which was not true at the time he had been sentenced. That case contains the language, "the saving clause has been held to bar applications of ameliorative criminal sentencing laws repealing harsher ones in force at the time of the criminal offense." *Id*. at 664 (citing cases from D.C., Second, and Fourth Circuits). That statement is true as far as it goes—a description of what three circuit court cases it cited for that proposition had done. And it accurately describes what the saving clause can do—it *can* bar the application of a later more lenient sentencing law when the offense happened before its passage.

But *Marrero* did nothing to change what the Supreme Court made clear over one hundred years ago: the

saving statute does not bar a later law's lower penalties from immediately taking effect if Congress wants them to. The Supreme Court explained that because the saving statute "only has the force of a statute, its provisions cannot justify a disregard of the will of Congress as manifested either expressly or *by necessary implication* in a subsequent enaction." *Great Northern Ry. Co. v. United States*, 208 U.S. 452, 465 (1908) (emphasis added); *see also id.* at 466 (analyzing whether statute "expressly or by fair implication" conflicted with general rule in saving statute). *Marrero* explicitly reaffirmed that principle. It stated that "only if [the statute at issue there] can be said *by fair implication or* expressly to conflict with § 109 would there be reason to hold that [the statute at issue] superseded § 109." 417 U.S. at 659 n.10 (emphasis added). The Supreme Court in *Marrero* did not find in the new law a fair implication that Congress wanted someone like Marrero to be parole eligible; indeed, the statute there had a saving clause of its own. The relevant point from *Marrero* for our case is that it reaffirmed *Great Northern*. And that remains the law. *See Douglas*, 644 F.3d at 43; *see also Marcello v. Bonds*, 349 U.S. 302, 310 (1955).

So Congress did not need to say in the Fair Sentencing Act, "this Act applies to any person sentenced hereafter for crack cocaine offenses, even if the conduct giving rise to conviction took place before this Act's passage," for it to apply in all sentencings thereafter. That would be one way to do it. But the Supreme Court does not require it. The other way, which has the exact same effect, is for Congress to manifest by "fair

implication" its will to extinguish the higher mandatory minimums for crack cocaine offenses for all defendants sentenced after the Act's passage.

That is the implication of the Fair Sentencing Act.


## IV.

Only one reasonable implication can be drawn from section 8 of the Act, which provides:

> SEC. 8. EMERGENCY AUTHORITY FOR UNITED STATES SENTENCING COMMISSION.
>
> The United States Sentencing Commission shall—
>
> > (1) promulgate the guidelines, policy statements, or amendments provided for in this Act as soon as practicable, and in any event not later than 90 days after the date of enactment of this Act, in accordance with the procedure set forth in section 21(a) of the Sentencing Act of 1987 (28 U.S.C. 994 note), as though the authority under that Act had not expired; and
> >
> > (2) pursuant to the emergency authority provided under paragraph (1), make such conforming amendments to the Federal sentencing guidelines as the Commission determines necessary to achieve consistency with other guideline provisions and applicable law.

Pursuant to 18 U.S.C. § 3553(a)(4)(A)(ii), sentencing judges are to employ the guidelines that are in effect on the date of sentencing. *See also* U.S.S.G. § 1B1.11(a). With that knowledge, and invoking "emergency" authority, Congress demanded that the lower guidelines take effect in sentencings "as soon as practicable" and within ninety days at the absolute latest. That means Congress wanted guidelines based on an 18:1 powder/crack ratio to take effect right away, even in sentencings where the offender's conduct pre-dated the Act. (There are bound to be many such cases in light of the five-year statute of limitations for drug offenses, 18 U.S.C. § 3282, and the time it takes to investigate and prosecute such cases.) The Commission promulgated new guidelines consistent with the FSA on November 1, 2010, and these "became applicable to all defendants sentenced after that date, *regardless of when they committed their crimes*." *United States v. Watts*, 2011 WL 1282542, at *8 (D. Mass. Apr. 5, 2011).

It makes no sense for Congress to will that guidelines based on an 18:1 ratio take effect immediately in sentencings even for crimes committed before the Act if those same defendants would be subject to pre-FSA 100:1 mandatory minimums. Why would Congress want that? That kind of sentencing scheme makes no sense. We are required to interpret statutes in a way that does not lead to nonsensical results. *United States v. Rutherford*, 442 U.S. 544, 552 (1979). Congress's will must have been either that the 18:1 ratio apply to all persons sentenced after the Act, or that the 18:1 ratio apply only to persons whose conduct took place after the Act.

The language Congress chose to use supports only the former. It demanded of the Sentencing Commission, "Use the 18:1 ratio. ASAP." That meant that for sentencing judges using the new guidelines, "Use the 18:1 ratio. ASAP." The fair implication of these demands is that Congress meant "Use the 18:1 ratio. ASAP" in all aspects of sentencing. It's really the only implication that makes sense.

Congress also demanded in section 8 that the Commission amend its guidelines "to achieve consistency" with "applicable law," meaning the new statutory minimums. The directive of "consistency" further shows Congress's will that the FSA be applied to pending cases, since the guidelines would be applied to pending cases. Using a pre-FSA 100:1 minimum coupled with an 18:1 guideline to decide a sentence does not "achieve consistency." It achieves the opposite. *Cf. Abbott v. United States*, 131 S. Ct. 18, 28 (2010) (rejecting interpretation that "would result in sentencing anomalies Congress surely did not intend").

And in section 10 of the FSA, Congress directed the Sentencing Commission to study the effects of the FSA and submit a report to Congress regarding the impact of the changes in federal sentencing law "[n]ot later than 5 years after the date of enactment of this Act." Under our circuit's rule, and in light of the five-year statute of limitations on drug offenses, "during the time period in which the Sentencing Commission is supposed to produce a report on the effects of the FSA, the Act will often be inapplicable." *United States v. Dixon*, 2011 WL 3449494, at *6.

The context surrounding the statute's passage is important too. Exceptions to even clear statutes are to be implied to prevent "consequences obviously at variance with the policy of the enactment as a whole." *Rutherford*, 442 U.S. at 552. The policy driving the FSA was the elimination of mandatory minimum sentences that had no basis in fact or law, were based on false assumptions, and that Congress and the Attorney General and the Sentencing Commission and the President all believed were inherently unjust. Congress stated its goal for the FSA in its Preamble: "To restore fairness to Federal cocaine sentencing." Congress believed that passing the new mandatory minimums helped restore that "fairness." At a fundamental level, then, as the Attorney General asked in his memorandum, and other courts ask too, why would Congress want sentencing judges to *continue* to impose sentences that it had already declared to be unfair?

There is no good answer to this question.

The fair, necessary, and only implication from the FSA is that Congress expected and intended its mandatory minimums to apply immediately.

## V.

There are other arguments that could be made against this reading, but none convince me that the FSA does not apply in all sentencings after it became the law. It is true that with a line drawn at the date of effect, there will be instances where persons who pled guilty early

on in their cases or who did not try to evade capture do not benefit from the new mandatory minimums, unlike others who committed a crime on the same day or even were involved in the same criminal activity. But a line must be drawn somewhere. We cannot avoid that. To draw the line at conduct, when Congress's whole point was to get rid of unjust 100:1-based sentences, and to do so right away, would mean that "the legislative mind will be set at naught." *Great Northern Ry. Co.*, 208 U.S. at 465. Congress gets to draw the line, and it drew it at its passage. *Cf. United States v. Acoff*, 634 F.3d 200 (2d Cir. 2011) (per curiam) (declining to apply the FSA to defendant who had already been sentenced but had not yet exhausted his appeals).

Some of my colleagues contend it would not be fair to give less time to the co-conspirator who insisted on a trial and who thus was sentenced after the FSA, while giving more time to the cooperator who was sentenced before that date. But this fails to take into account two important sources of flexibility that are available to the district court. First, for the cooperator sentenced before the effective date, the government could move for a sentence below the statutory minimum or (more likely) file a motion to reduce the sentence under Federal Rule of Criminal Procedure 35(b)(2). *See also* Fed. R. Crim. P. 35(b)(4) ("When acting under Rule 35(b), the court may reduce the sentence to a level below the minimum sentence established by statute."). For the person sentenced after the FSA's effective date, the district court still has the option of choosing a sentence above the guidelines range, as long as it stays below the normally

very high statutory maximum, if the court thinks that a higher sentence is appropriate for the person who went to trial. In short, there is plenty of authority to fine-tune in the system, and so the unfairness to which my colleagues allude is unlikely to come about.

Nor does my position mean that any time Congress reduces a sentence for an offense that the lower penalty takes effect in all sentencings immediately. The Fair Sentencing Act is no ordinary statute. It makes no sense for Congress to make it an "emergency" to get 18:1 guideline ratios in place if it wanted 100:1 minimums it found inherently unjust to stay. Making it an "emergency" to get 18:1 guidelines in place if the 100:1 minimums still had effect makes even less sense because the guidelines were not the biggest emergency. District judges have been able to sentence crack cocaine offenders more comparably to powder cocaine offenders since the Supreme Court gave them the discretion to do so. *See United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 552 U.S. 85 (2007). Congress knew that. Anyone following this issue knows that. The advisory nature of the guidelines means that it was not the guidelines that were the biggest impediment to "restore fairness in Federal cocaine sentencing." The 100:1 mandatory minimums were the biggest problem because they were just that, mandatory. Even knowing that, Congress made getting more equitable guidelines into place a matter of emergency. If getting only-advisory guidelines into place was a matter of emergency, taking 100:1 mandatory minimums off the books must have been what, a code blue?

To point to *Neal v. United States*, 516 U.S. 284 (1996), as supporting a contrary reading is to miss the point. In *Neal*, the Court held that the Sentencing Commission's method of calculating LSD weight didn't control the weight calculation for purposes of a statute setting mandatory minimum sentences. 516 U.S. at 294-95. That's obvious. But our case is about what *Congress* did, not the Sentencing Commission. There was no change to a statutory mandatory minimum or maximum in *Neal*. *See id.* The only change there was made by the Sentencing Commission. *See id.* at 292-94. Section 8 matters because it's what *Congress* said, and what Congress said shows it wanted the new sentences in effect right away.

And to emphasize the 2007 amendments to the sentencing guidelines also misses the mark. Despite the changes in offense levels that resulted from those 2007 amendments, "[t]he amended Guidelines still produce[d] sentencing ranges keyed to the mandatory minimums in the 1986 Act." *Kimbrough*, 552 U.S. at 99 n.10. The only difference was that under the 2007 amended guidelines, "the 5- and 50-gram quantities produce[d] 'base offense levels corresponding to guideline ranges that include[d] the statutory mandatory minimum penalties,'" as opposed to ranges that slightly exceeded those statutory mandatory minimums. *Id.* (citing United States Sentencing Commission, Report to Congress: Cocaine and Federal Sentencing Policy 8 (May 2007)) (emphasis omitted). That the base offense level for one who distributes 1 kilogram of crack cocaine remains the same after the FSA and 2010 guideline amendments is also irrelevant: that individual's base offense level, 34, corre-

sponds to a range that exceeds even the post-FSA ten-year mandatory minimum, and does not create an inconsistency. That the 2007 guideline amendments were not linked to a change in the statutory penalties is obvious—there *were* no statutory changes to the mandatory minimums in 2007. And so, despite my colleagues' reliance on them, the 2007 amendments did not produce the illogical disparity between the statutory minimums and the guideline ranges that our rule in *Fisher* perpetuates, and do not assist us in determining whether Section 8 of the FSA, which seeks to achieve consistency, is a "fair implication" under the Savings Statute.

And, as I have already discussed, a contrary result is nonsensical. Anthony Clardy's case illustrates that. The Sentencing Commission acted urgently at Congress's direction and promulgated new guidelines for crack cocaine offenses on November 1, 2010. Clardy was sentenced after that. The district court judge looked to the new guidelines recommended by the Sentencing Commission, as all agree he should do. These guidelines were "consisten[t]" with the ratios reflected in the new mandatory minimums as Congress had directed they be. And what did the guidelines recommend for Clardy's involvement with 13 grams of crack cocaine? A sentence of 30 to 37 months' imprisonment, even in light of his prior drug conviction that coupled with more than 5 grams of crack cocaine triggered a 120-month mandatory minimum under the old law. The necessary and fair implication of the Fair Sentencing Act is that Congress did not want the baseless 120-month mandatory minimum that existed before it to apply to Clardy. It wanted him sentenced more fairly.

That Clardy takes no benefit from the FSA demonstrates another reason why Congress could not have wanted our circuit's interpretation. That reading also, as I explained in my *Fisher* dissent, 2011 WL 2022959, at *2, benefits the *worst* offenders, as they are the ones who stand to benefit from the new guidelines since their guidelines range would be reduced, potentially to just above the statutory minimum. But for someone like Clardy, whose drug quantity was too small to trigger any mandatory minimum sentence at all under the Fair Sentencing Act, he receives only the knowledge that the members of the Sentencing Commission think the just sentence for him is nearly four times shorter.

Finally, the government had initially cited *Landgraf v. USI Film Products*, 511 U.S. 244 (1994) to us, and it is now the first case to which some of my colleagues point. *Landgraf*, of course, was a civil case. The Court held there that a petitioner could not benefit from more favorable damages provisions in the Civil Rights Act that took effect while her case was on appeal. The FSA, in contrast, is clearly not a statute that "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Cf. Landgraf*, 511 U.S. at 280. Nor does it raise any constitutional concerns with its application, as the attempt to invoke the Civil Rights Act's punitive damages provision, *id.* at 281, or a *higher* penalty in a criminal case would. *Landgraf* also says that, "[w]hen [an] intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive." *Id.* at 273.

The necessary implication of the Fair Sentencing Act is that its mandatory minimums apply in all sentencings after its passage. Declining to read the FSA to apply to offenders like Anthony Clardy would "undercut the bill's primary objective," "result in sentencing anomalies Congress surely did not intend," benefit the "worst offenders," give "rise to . . . oddities," and "not necessarily promote more equitable outcomes." Those are not my words. They are the words of the Supreme Court from just last year, when it rejected a reading of a mandatory minimum statute that would do all those things. *See Abbott v. United States*, 131 S. Ct. 18, 27-28 (2010).

## VI.

The conclusion that the Fair Sentencing Act applies in sentencings, all sentencings, after its passage is not reached just by me, or my colleagues who join me. It is the conclusion reached by the Attorney General of the United States, and it is the official position the federal government will be taking in every federal court across the country. That is significant. We also rarely see such a complete change of course from it. One of those times was last year, with respect to whether sentencing judges could consider the crack/powder disparity inherent in the career offender guideline. The government's change of position, along with the fact that no other circuit had agreed with our holding that judges could not, led us to reflect further and helped us change our mind in *United States v. Corner*, 598 F.3d 411 (7th Cir. 2010)

(en banc). Here too, I think the new developments are worthy of reflection, and help show why our initial interpretation was not the right one. (I'm not sure what more the Attorney General needs to say, or would say that is any different than that said here or by my dissenting colleague, to help understand the position that the FSA took effect in all sentencings upon its enactment. The Solicitor General's brief that some of my colleagues found to be so helpful in resolving *Corner* made the same arguments already made by the dissenters in the denial of rehearing en banc in the case *Corner* overturned. *See United States v. Welton*, 583 F.3d 494, 500-04 (7th Cir. 2009).)

And although I think the text of the statute is clear and yields only one result, to the extent it is unclear, we should keep the rule of lenity in mind too. Under it, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Skilling v. United States*, 130 S. Ct. 2896, 2932 (2010); *see also United States v. Granderson*, 511 U.S. 39, 54 (1994) ("In these circumstances—where text, structure, and history fail to establish that the Government's position is unambiguously correct—we apply the rule of lenity and resolve the ambiguity in [the defendant's] favor."). That rule favors applying the FSA in all sentencings after its passage. *See Douglas*, 644 F.3d at 44. That the Attorney General, the First, Third and Eleventh Circuits, and many district court judges around the country have reached the conclusion opposite from us only supports a finding that at the least there is ambiguity in the statute, and that

it is not clear the FSA should not apply to everyone sentenced after it. Indeed, the rule of lenity is "rooted in the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." *United States v. R.L.C.*, 503 U.S. 291, 305 (1992) (plurality opinion) (quotations omitted).

It is the instinctive distaste against men and women, but mainly African-American men like Anthony Clardy, languishing in prison for committing crimes of crack rather than powder cocaine, that led Congress to pass the Fair Sentencing Act. That Congress wanted the new "fair" sentences to apply to *everyone* sentenced after the Fair Sentencing Act became law, not just to some, is the necessary implication of what it did.

POSNER, *Circuit Judge*, dissenting from denial of rehearing en banc. I join Judge Williams's dissent unreservedly, but offer this modest supplement to her excellent opinion.

Congress cannot bind successor Congresses. The fact that the general saving statute says that a repeal is not retroactive unless the repealing statute "expressly" states that it is, 1 U.S.C. § 109, is some indication that a

repealing statute which, like the Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 (Aug. 3, 2010), does not say in so many words that its provisions are retroactive is not. But the absence of an express statement is not proof and did not bind the Congress that enacted the Act last year. That may be why the Supreme Court has said that a "necessary implication" of a new statute would suffice to make it retroactive notwithstanding the saving statute's word "expressly," *Great Northern Ry. v. United States*, 208 U.S. 452, 465 (1908), and why the Court further reduced the force of the saving statute by later replacing "necessary implication" with "fair implication." *Warden, Lewisburg Penitentiary v. Marrero*, 417 U.S. 653, 659 n. 10 (1974).

That interpretive standard is met in this case—a conclusion reinforced by the principle that statutes are not to be interpreted literally when literal interpretation would produce absurd results. "If literalness is sheer absurdity, we are to seek some other meaning whereby reason will be instilled and absurdity avoided." *Outlet Embroidery Co. v. Derwent Mills, Ltd.*, 172 N.E. 462, 463 (N.Y. 1930) (Cardozo, C.J.); see also *Commissioner v. Brown,* 380 U.S. 563, 571 (1965); *Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 527 (1989) (concurring opinion); *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 284-85 (7th Cir. 2002); *United States v. Balint*, 201 F.3d 928, 932 (7th Cir. 2000); *In re Kaiser Aluminum Corp.*, 456 F.3d 328, 338 (3d Cir. 2006); *Flynn v. Commissioner*, 77 F.2d 180, 183 (5th Cir. 1935). "Even strict constructionists reject literal interpretation when the result would be senseless." *United*

*States v. Hudspeth,* 42 F.3d 1013, 1014 (7th Cir. 1994) (en banc).

Congress in section 2 of the Fair Sentencing Act, seeking to correct the unwarranted disparity in punishment for crimes involving crack and powder cocaine, raised the drug quantities needed to trigger the 5-, 10-, and 20-year mandatory minimum sentences for offenses involving crack imposed by 21 U.S.C. § 841(b). And in section 8 it directed the Sentencing Commission to amend the relevant sentencing guidelines within 90 days to conform them to the provisions of the new statute. The Commission did so.

The Commission cannot amend the statute that imposed the old statutory minimum sentences. See *Neal v. United States*, 516 U.S. 284, 294-95 (1996). (But that is all that *Neal* holds, so far as bears on this case.) The question is whether the new statute, by changing the statutory minimum sentences and ordering the Commission forthwith to change its guidelines to comply with the new minimums, "fairly implies" that the new minimums govern all sentences imposed after the new statute took effect. The defendants were sentenced between February 7 and March 4 of this year, and thus after the Fair Sentencing Act was signed into law on August 3 of last year. Because their drug quantities were below the triggering levels for the new mandatory minimum sentences, if sentenced under the amended guidelines they could each receive a substantially reduced sentence.

Sentencing guidelines are applicable to all sentencings that occur after they are promulgated regardless of

when the crimes for which the sentences are being imposed were committed. 18 U.S.C. § 3553(a)(4)(A)(ii). So unless the Act's revised mandatory minimum sentences are also applicable to these defendants, they will receive sentences in excess of the sentencing guidelines that Congress—in directing the Sentencing Commission to make haste to conform them to the new, more lenient statutory minimums (more lenient because of the enhanced quantity thresholds)—intended would apply to such defendants.

The perverse results of a literal interpretation are illustrated in the following tables. The first is general, the second specific to the four defendants in the present cases.

|  | Mandatory Minimum (months) | | Guidelines Range (months) (Criminal History = II) | |
|---|---|---|---|---|
|  | Pre-FSA | FSA | Pre-FSA | FSA |
| **5g** | 60 | none | 57–71 | 24–30 |
| **15g** | 60 | none | 57–71 | 37–46 |
| **28g** | 60 | 60 | 70–87 | 70–87 |
| **35g** | 60 | 60 | 87–108 | 70–87 |
| **50g** | 120 | 60 | 108–135 | 70–87 |
| **100g** | 120 | 60 | 108–135 | 70–87 |
| **280g** | 120 | 120 | 135–168 | 135–168 |
| **500g** | 120 | 120 | 168–210 | 135–168 |
| **2kg** | 120 | 120 | 210–262 | 168–210 |

| Defendant | Quantity | Criminal History Category | FSA Guidelines Range | Pre-FSA Mandatory Minimum | % Increase in Minimum Sentence If FSA Inapplicable |
|---|---|---|---|---|---|
| Christopher Holcomb | 20.7 g | IV | 46–57 months | 60 months | 5% – 30% |
| Anthony Clardy | 13.1 g | III | 30–37 months | 120 months | 224% – 300% |
| Kenneth Brown | 124 g | VI | 151–188 months | 240 months | 28% – 59% |
| Patrick Moran | 23.9 g | V | 70–87 months | 120 months | 38% – 71% |

There is no reliance interest in punishing these defendants under the old law. And it would be fanciful to suggest (and there is no indication) that members of Congress who opposed the Fair Sentencing Act were so chagrined that a handful of defendants might get lighter sentences during a period of transition before the new law became fully effective that they exerted themselves to prevent the inclusion in the Act of an express statement that the new guidelines would override the old statutory minimums for defendants sentenced after the Act's effective date. Realism suggests that the opponents were conciliated not by the omission of an express statement authorizing retroactive sentencing but by sections 4 through 6 of the Act, which increase the punishments for some drug offenses.

It would not be arbitrary to give these defendants the benefit of the new law and the new guidelines, but not defendants sentenced under the old law before the new one was passed; for to allow those defendants to be

resentenced would wreak havoc on finality in criminal proceedings. It is true that the Sentencing Commission has decreed that on November 1 of this year the new guidelines will become retroactive, meaning that defendants sentenced under the old guidelines will be eligible to seek resentencing under the new ones. But those defendants, if their crimes predated the effective date of the Fair Sentencing Act, will continue to be subject to the old statutory minimum sentences. As a result, the number of defendants eligible to be resentenced will be, in the Commission's estimation, manageable (approximately 12,000). See News Release, "U.S. Sentencing Commission Votes Unanimously to Apply Fair Sentencing Act of 2010 Amendment to the Federal Sentencing Guidelines Retroactively" (June 30, 2011), www.ussc.gov/Legislative_and_Public_Affairs/Newsroom/Press_Releases/20110630_Press_Release.pdf (visited July 30, 2011).

All that can be said in favor of punishing under the old law defendants not yet sentenced when the new one took effect is that if Congress were omnicompetent it would, out of an abundance of caution, have "expressly" directed that sentences imposed after the new law went into effect would be subject to the guideline amendments that the new law ordained. An omnicompetent Congress, leaving nothing to chance, would have made this express statement even though the Supreme Court has said in *Great Northern* and *Marrero* that courts should treat a "fair" or "necessary" implication in a new statute as sufficient to override the saving statute. A few judges may think that Congress *is* omnicompetent; more pretend to think that—what they really think

being that literal interpretation of statutes is necessary to save the nation from judicial tyranny. Such questionable thinking can lead to gratuitously silly results in particular cases—these cases, for example.